*Court of Appeals*
*Fourth Court of Appeals District of Texas*
*San Antonio*



★ ★ ★ ★ ★ ★ ★

## OPINION

No. 04-10-00787-CR

Armando **RAMOS**,
Appellant

v.

The **STATE** of Texas,
Appellee

From the 437th Judicial District Court, Bexar County, Texas
Trial Court No. 2008CR3362
Honorable Lori I. Valenzuela, Judge Presiding

Opinion by:    Karen Angelini, Justice

Sitting:        Karen Angelini, Justice
               Sandee Bryan Marion, Justice
               Steven C. Hilbig, Justice

Delivered and Filed:  February 22, 2012

AFFIRMED

Armando Ramos was found guilty of possession with intent to deliver a controlled substance and was sentenced to thirty-five years in prison. In one issue, he argues the trial court erred in refusing his requested Article 38.23 jury instruction. We affirm.

After receiving information from a confidential informant that Ramos was selling narcotics from his residence, Detective Pete Wellman of the San Antonio Police Department verified that Ramos lived at the residence in question and then began surveillance, during which

Detective Wellman saw several people make what appeared, in his experience, to be narcotics transactions. He submitted an affidavit in support of a search warrant to a magistrate, who signed a warrant permitting the search of "the premises described as a one story, wood-framed residence, known as and numbered as 2013 S. San Jacinto, and any and all available edifices, openings, garages and enclosures thereto." The warrant commanded the sheriff or any peace officer to enter and search the premises for heroin, and to take possession of same. The warrant further commanded the officer to arrest Ramos, "or persons who are alleged to be in charge of the above described premises, and to arrest all other parties found in said premises or making their escape therefrom, where said parties are found to be in possession of the above described controlled substance or any other controlled substance in violation of the Texas Health and Safety Code . . . ." Detective Wellman and other officers then executed the warrant. In conducting the search, Detective Wellman smashed Ramos's toilet with a sledge hammer and found plastic bags of heroin and marijuana.

At trial, Ramos requested an Article 38.23 instruction regarding whether the drugs were discovered in a place authorized by the search warrant. Ramos argued that there was a fact question about whether the drugs were found in the residence or whether they were found in the main pipe underneath the toilet:

> [T]he testimony was that the warrant authorized [the police] to search the residence . . . and I think there's a fact issue about whether – if the jury chooses to believe that that evidence was seized, but that it was in the main pipe underneath the toilet, then I think there is a fact question about whether or not that is the residence. If it's not the residence, then the warrant doesn't authorize them to seize anything. . . . And I can understand if this is a situation where they are looking in pipes – interior pipe, you know, maybe inside the wall of a home, but this is underneath. . . . Now, again, there is some conflicting evidence I think between where the detectives – you know, where they witnessed things. But I think that is a fact issue to be resolved by the jury.

The trial court denied the request. On appeal, Ramos argues that the trial court erred in denying the instruction because there is a fact issue regarding whether the search exceeded the scope of the warrant.

A defendant's right to the submission of jury instructions under Article 38.23(a) is limited to disputed issues of fact that are material to his claim of a constitutional or statutory violation that would render evidence inadmissible. *Madden v. State*, 242 S.W.3d 504, 509-10 (Tex. Crim. App. 2007). Where no issue is raised by the evidence, the trial court acts properly in refusing a request to charge the jury. *Id.* at 510. There are three requirements that a defendant must meet before he is entitled to the submission of a jury instruction under Article 38.23(a):

(1) The evidence heard by the jury must raise an issue of fact;

(2) The evidence on that fact must be affirmatively contested; and

(3) That contested factual issue must be material to the lawfulness of the challenged conduct in obtaining the evidence.

*Id.* Thus, there must be a genuine dispute about a material fact. *Id.* If there is no disputed factual issue, the legality of the conduct is determined by the trial court alone, as a question of law. *Id.* And if other facts, not in dispute, are sufficient to support the lawfulness of the challenged conduct, then the disputed fact issue is not submitted to the jury because it is not material to the ultimate admissibility of the evidence. *Id.* The disputed fact must be an essential one in deciding the lawfulness of the challenged conduct. *Id.* at 511. Here, Ramos argues there is a factual dispute about whether the drugs were discovered in a place authorized by the warrant. In support, he points to the testimony of the officers about the execution of the warrant.

At trial, Detective Wellman first testified about executing the warrant. According to Detective Wellman, Ramos's residence was a "shotgun" house,[1] consisting of only three rooms, with the front door and back door facing one another. Detective Wellman testified that because there was a burglar bar on the front door, the officers used a tool to open the burglar bars. As officers were attempting to open the bars on the door, Detective Wellman heard someone say, "He's running towards the back." The front door was finally opened by someone in the home. There were three people in the home. As the officers entered the home, several heard the toilet flush. Ramos walked from the bathroom. Detective Wellman asked Ramos "how much dope he got rid of." According to Detective Wellman, Ramos responded, "I just flushed a little bit of marijuana." So, Detective Wellman took a sledge hammer and broke the toilet. He found marijuana and heroin inside. He explained where he found the drugs:

> A: You got the seat portion of the toilet and then the frame that comes down into the floor. Well, without breaking [the toilet], if you can lift it, unscrew the two bolts and lift it up, there's just a hole in the floor with a – either rubber gasket or a wax gasket that goes down, I guess. I'm not a plumber. So I'm assuming it goes to the main sewer. And floating right on top of the water there is a bag of marijuana and a bag of heroin.
>
> Q: Okay. In that round seal attached to the floor?
>
> A: Correct.
>
> Q: Okay. And it was sitting right there on top?
>
> A: Yes.

Detective Cruz Castellon next testified. According to Detective Castellon, as he was attempting to open the front door, he could hear footsteps running toward the back of the home. He heard other officers yelling at the back of the house, "They're running. They are running."

---

[1] According to Detective Wellman, houses were referred to this way because "in the old days you could take a shotgun and shoot it through the front door and it would go through the back door and not hit anything else. That's basically a shotgun dwelling."

And then he heard the officers yell, "He's flushing." As Detective Castellon entered the home, he saw the woman who opened the door, a wounded man on a bed, and Ramos coming from around a corner where the bathroom was located. Detective Castellon then handcuffed Ramos. From that point on, the extent of his duties was to secure the three persons found in the home. He did not participate in the search of the home.

Similarly, Detective Guadalupe Ruiz testified that he entered with the front door entry team and was the first person through the front door. As he entered the residence, he saw someone run towards the bathroom and then heard a toilet flushing. He then saw "the defendant coming out of the bathroom area." Ramos and the two other people present were then taken into the living room. The search warrant was read to them as well as their Miranda rights. According to Detective Ruiz, about thirty minutes after the search started, Detective Wellman broke the toilet and found the drugs. When asked whether the drugs were found in the pipes underneath the toilet, Detective Ruiz stated that he did not know "exactly where they recovered them." "I just know they busted the toilet and found them."

Besides Detective Wellman, Detective Rodney Denton is the only other officer who testified about being present during the destruction of the toilet. Detective Denton testified that after Detective Wellman read the search warrant to the occupants of the residence, and their Miranda rights, Detective Wellman went to the bathroom with a sledge hammer and "busted" the toilet. According to Detective Denton, the toilet shattered into pieces. He then explained where the drugs were found:

> A: [T]he back of the toilet has a curve in it that goes down to the drain, and that broke open and there was marijuana in a baggy and balloons – small balloons filled with heroin in a baggy.
>
> Q: And these pipes that the drugs were found in, were these pipes in the house?

A: Didn't actually make it to the pipes. It was in the – it was in the – the trap, the p-trap of the toilet inside the house.

Q: So still technically in the toilet?

A: Yes, sir.

Q: It's in, I guess, the plumbing inside the toilet; is that fair?

A: It's – it's all part of the toilet. So it's not a pipe, it's the – the trap that the water goes down and takes everything down into the pipe.

Q: Could I ask you to do something? And I know we didn't talk about this so feel free to tell me no, I guess. But, you know, some of the jurors may not be all that familiar with the inside of a toilet. Do you mind drawing a picture so that they may have a better idea of what exactly we are talking about?

A: I'll try.

Q: Here's a couple of markers you can choose from.

A: Okay. As best as I can draw, you have the tank to the toilet, you have the toilet bowl, and this area back here where water comes down and the water drains back into this area. You have a curve, kind of like a p-trap, kind of like underneath the sink. And the waste or whatever will go back there. And it leads – this area leads down to the pipe where everything that is flushed down the toilet goes. The baggies that I am talking about when this was broken open was in this p-trap area. I don't know if that's the correct term, but that's – that's where it was when it was broken open – it broke open and there it was laying before it go to the pipe.

Q: So this area . . . where the drugs were found, this is still – was before the toilet was broken, this was still part of the toilet?

A: Yes.

Q: Okay. And the toilet obviously is inside the house?

A: Yes.

Ramos argues that Detective Wellman's testimony "puts the narcotics in the drain pipe itself" while Detective Denton "claimed that the drugs were definitely in the toilet itself." According to Ramos, "[t]he disputed fact to be resolved is whether the narcotics were found in the pipe underneath the toilet, and if so, whether that was part of the residence, or whether they were found in the toilet itself." Ramos argues that "[i]f the narcotics were not found pursuant to the search warrant, then the jury would be required to disregard the evidence."

In considering the above testimony, however, we find no issue of material fact because Detective Wellman's testimony does not support the conclusion that the search of the drugs exceeded the scope of the warrant. When examining the description of the place to be searched to determine the warrant's scope, we follow a common sense and practical approach, not a "Procrustean" or overly technical one. *Long v. State*, 132 S.W.3d 443, 448 (Tex. Crim. App. 2004). The court of criminal appeals has explained that when a warrant uses the legal term "premises," we should interpret its use in a given warrant to "portray the intent with which it was embraced in the document." *Id.* Thus, the court has explained that a warrant to search a premises, "namely the defendant's residence, No. 1700 Brooklyn Street, City of Beaumont, Jefferson Co., Texas," authorized the officers to search "not only the mansion house but the garage [located about 40–50 feet away from the house] upon the same lot forming a part of the curtilage." *Id.* The court of criminal appeals explained why it reached this common-sense conclusion:

> The right to enter and search a person's home—his bedroom, his bathroom, his kitchen, all of his most intimate preserves—must surely carry with it the right to search those areas less private and less protected that are nonetheless part and parcel of his residence, areas such as a garage, tool shed, or chicken coop. The right to invade and rummage through a man's home—his personal private castle—necessarily includes the right to search the less-private outbuildings. The converse is not true. Authorization to search the stables does not carry implicit authority to search the master's bedroom.

*Id.* In this case, whether the plastic bags containing the drugs were found in the p-trap of the toilet or whether they were found "floating right on top of the water" at the point where the toilet connects to the drain makes no difference as both these locations are part of the "premises" authorized to be searched. There is simply no material issue of fact for the jury to determine regarding the scope of the warrant. We therefore affirm the judgment of the trial court.

Karen Angelini, Justice

Publish